## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA** | **Case No. 24-CR-193 (CJN)** |
| **v.** | |
| **ALONZO LOVER,** | |
| **Defendant.** | |

## UNITED STATES' MEMORANDUM IN SUPPORT OF PRE-TRIAL DETENTION

The United States respectfully submits this memorandum in support of its oral motion for detention pending trial under 18 U.S.C. §§ 3142(d)(1)(A)(iii) (on probation or parole), 3142(f)(1)(A) (crime of violence), and 3142 (f)(1)(E) (felony involving possession of a firearm). Defendant Alonzo Lover is charged with: (1) Unlawful Possession of a Firearm, in violation of 18 U.S.C. § 922(g)(1); (2) Assault with Intent to Kill While Armed and Aiding and Abetting ("AWIK w/A"), in violation of D.C. Code §§ 22-401, 4502, 1805; and (3) Possession of a Firearm During a Crime of Violence or Dangerous Offense ("PFCOV"), in violation of D.C. Code § 22-4504(b), for a drive-by shooting on April 2, 2024. There is no condition or combination of conditions that will assure the safety of the community and all four statutory factors in § 3142(g) strongly favor pretrial detention. Thus, the government requests that the Court order the defendant detained pending trial.

## Factual and Procedural History

On April 2, 2024, Officer Melvin Cruz was in full uniform, operating a marked scout car located in front of 2758 Bruce Place, Southeast, Washington D.C. 20020. Officer Cruz was facing west towards the intersection of Bruce Place and Raynolds Place, Southeast, Washington, D.C. At approximately 11:25 AM, Officer Cruz saw a black sedan and, immediately behind it, a red Kia

Borrego SUV stopped in front of 2802 Bruce Place, Southeast, Washington, D.C. 20020. Officer Cruz then saw two individuals wearing dark clothes, one in the rear passenger seat and one in the front passenger seat, hanging out of the vehicle. Simultaneously, Officer Cruz saw gun smoke and heard multiple sounds of gunshots.

Police officers canvassed the area for CCTV and found a camera that captured the shooting. Specifically, as shown in the still photos below, the front passenger of the red SUV (later identified as defendant Lover) and the back seat passenger (later identified as co-defendant Warfield) were captured leaning out the windows of the red SUV and shooting at a gray Mercedes-Benz sedan. Lover was shooting a rifle with blue markings and Warfield was wearing blue gloves and shooting a handgun.



*Figure 1: Warfield (rear passenger) and Lover (front passenger) Shooting at Complainant.*

The gray Mercedes-Benz sedan was later identified as belonging to the complainant, who explained that he was driving on Morse Road, Southeast, when he noticed the red SUV following his car. When the complainant made a left onto Bruce Place, Southeast from Fort Place, Southeast, the red SUV pulled up beside his driver's side door and began shooting into his vehicle. The

2

complainant's vehicle sustained one bullet hole to the rear windshield window, two bullet holes to the passenger front window, and one bullet hole to the passenger side mirror.

After the shooting, the red SUV made a right onto the 2300 block of Raynolds Place, Southeast, Washington D.C., and Officer Cruz followed it. A minute later, at approximately 11:26 AM, Officer Cruz next saw the vehicle resting along the wood line on 22nd Street, having traveled off the street and over the curb. Officer Cruz then immediately chased three individuals on foot after they fled the red SUV. The location of the shooting is indicated in the map below with a red mark and the location of the crash is indicated with a yellow x.


*Figure 2: Map of Shooting and Red SUV Crash.*

In addition to Officer Cruz, two detectives witnessed the three individuals in the red SUV as it crashed. Prince George's County Police Department ("PGPD") Detectives Michael Stargel and Brendan Stokes were in the area for an unrelated matter and were outside of their unmarked

surveillance cars in the intersection of Harford Street and Langston Place, Southeast, when they heard several gunshots near their location.

Moments after he heard the gunshots, Detective Stargel saw the red SUV come down Langston Place, Southeast, at a high rate of speed and begin to lose control as it rounded the curve, almost striking Detective Stargel's vehicle. Detective Stargel observed the red SUV start sliding back and forth across Langston Place until it crashed into the wood line on 22nd Street, Southeast. Detective Stargel saw three people get out of the red SUV. The driver started walking towards 22nd Street until a marked MPD patrol vehicle pulled up, at which point he ran into the woods. Detective Stargel also saw two people get out of the passenger side of the red SUV and immediately run into the woods. One of the passengers was holding a blue rifle. Detective Stokes witnessed the same.

Detective Stargel also noted that the driver was wearing a black puffy coat and both passengers who exited were armed – one of the males from the passenger side was carrying a blue AK-47-style rifle and the second male from the passenger side was manipulating a pistol. Detective Stokes saw all three men run to the bottom of the ravine near the drainage creek and continue running toward Suitland Parkway. The drainage creek is circled in red in the map below and the location of the detectives' vehicles when they observed the crash and bail out is indicated with a pink x.



*Figure 3: Position of Detectives' Vehicle and Defendants' Approximate Flight Path.*

As MPD officers arrived, Detective Stokes directed incoming officers to Suitland Parkway to cut off the three men. Within six minutes of the shooting, all three men were apprehended and detained in the woods. The complainant was later taken to the crash scene in front of 3010 22nd Street, Southeast, by Detective Jones where the complainant positively identified the red Kia SUV as the vehicle from which the shots came.

Detective Jones contacted Individual 1, the owner of the red SUV, and asked for Individual 1's consent to process the vehicle for evidence. Individual 1 declined Detective Jones' request.

*Apprehension and Identification of Lover, Mullins, and Warfield*

At 11:31 AM – *just six minutes after the shooting* – Defendant Lover was detained by Officers Brandon Cyrus and Samuel Horst. At 12:21 PM, Detective Stokes positively identified Lover during a show-up identification procedure as one of the people he saw exit the passenger

side of the red SUV. Detective Stokes said that Lover was the individual armed with a blue AK-47 style rifle. In addition, Lover was wearing clothing consistent with the front-seat shooter as captured in the surveillance footage (*see* Figure 4, *infra*), absent a white hat. Notably, a white hat later was found in his flight path. Lover falsely identified himself to law enforcement as Marcus Adams and provided a date of birth of January 27, 1994. After his fingerprints were taken and scanned into the database at the police station, officers learned that his true name was Alonzo Lover.

At approximately 11:30 AM – *just five minutes after the shooting* – officers surrounded and detained co-defendant Mullins. While near the crash scene, Detective Stargel saw Mullins being brought out of the woods and positively identified Mullins as the driver of the red SUV. Mullins later provided officers his name and date of birth.

Co-defendant Warfield was detained by Officer Joubert Joseph at 11:29 AM – *four minutes after the shooting*. Warfield was wearing blue surgical gloves and a black hoodie with a slanted zipper pocket on the right side, consistent with what the back-seat shooter was wearing in the drive-by shooting. *See* Figures 4-7, *infra*. Moreover, as captured on body worn camera footage, Warfield was caught removing the blue gloves and discarding them on the ground as he was detained. During a show-up identification procedure at 12:16 PM, Detective Stokes positively identified Warfield as one of the people he saw exit the passenger side of the red SUV. Warfield provided officers his name and date of birth.



*Figure 4: Warfield (rear passenger) and Lover (front passenger) Shooting at Complainant.*



*Figures 5, 6, and 7: Warfield Wearing Blue Surgical Gloves at 11:29 AM When He Was Detained.*



*Figure 8: Warfield in Black Hoodie with Right Side Zipper Pocket in Forward Slanting Direction.*

After the defendants were detained, officers canvassed the woods in the defendants' flight path and found on the ground a black Glock 19 Gen 5 semi-automatic handgun (SN# BKRG362), with no round in the chamber and 11 rounds in a 15-round capacity magazine. The Glock 19 Gen 5 handgun appeared to be fully functional, capable of expelling a projectile by means of an explosive action, had a barrel length of less than 12 inches, and the ability to be fired by the use of a single hand.



*Figure 9: Recovered Glock 19 Gen 5 semi-automatic handgun.*

Officers also found a black semi-automatic Draco Norinco MAK-9 Sporter (SN# #35034) with blue tape wrapped around the barrel and loaded with one round in the chamber and 17 rounds in an unknown capacity magazine.



*Figure 10: Recovered Draco Norinco MAK-9 Sporter.*

The rifle recovered in the woods is consistent with the rifle used by the front-seat shooter as captured in the CCTV footage of the shooting and corroborates Detective Stokes' statement that he saw Lover carrying a blue rifle. S*ee* Figure 11, *infra*.



*Figure 11: Warfield (rear passenger) and Lover (front passenger) Shooting at Complainant.*

While canvassing the scene of the shooting, police found 9 mm and 7.62 x 39 mm shell casings in front of 2806 Bruce Place, Southeast, which were collected as evidence. National Integrated Ballistics Information Network ("NIBIN") results indicated a potential ballistics link between both the recovered Glock 19 handgun and the 9 mm casings recovered and the Draco rifle and the 7.62 x 39 mm casings recovered.

A search of government records revealed that neither Mullins, Warfield, nor Lover was licensed to carry a firearm or possess ammunition in the District of Columbia.

Following the defendants' arrest on April 2, 2024, all three defendants were presented to the Honorable Eric Glover in C-10 in D.C. Superior Court. After reviewing the Gerstein submitted in the case, Judge Glover found that there was insufficient probable cause for the charged offenses as it related to all three defendants. Judge Glover dismissed the case and released all three defendants.[1]

On April 3, 2024, all three defendants arrived at the MPD station together to collect their property. Accompanying the defendants was Individual 1, the owner of the red SUV used in the drive-by shooting, and the person who did not allow police officers to process her vehicle for evidence. During a conversation with Officer Garcia, Individual 1 gave Officer Garcia her name and phone number, stated that she was Lover's girlfriend, and that she should be the police contact for all three defendants. MPD released the defendants' property to them but did not release the SUV to Individual 1.

On April 4, 2024, officers canvassed the defendants' flight path through the woods a second time and recovered blue surgical gloves and a white baseball cap with the word "Nike" in

---

[1] Based on the transcript from the defendants' presentment, it is unclear whether the Court received the filed Supplemental Gerstein, which contained some of the additional facts described herein.

black lettering.



*Figure 12: The yellow box represents the **approximate** area where Mullins, Warfield, and Lover were detained, as well as where the Glock 19 was recovered. The red box reflects the **approximate** area where the white cap and Draco rifle were recovered.*

The white cap is consistent with the white baseball cap that Lover is seen wearing in the

CCTV footage of the drive-by shooting. *See* Figures 13 and 14.



*Figures 13 and 14: Lover Wearing White Baseball Cap.*



*Figure 15: Baseball Cap Recovered from the Woods Where Lover Was Arrested.*

On April 29, 2024, Lover was arrested and had his initial appearance the next day. At the defendant's initial appearance, the government orally moved for detention pending trial pursuant to the above-referenced provision of the federal bail statute, and any additional provisions that may apply upon review of the Pretrial Services Agency report ("PSR"). A detention hearing was set for May 3, 2024, at 1:30 PM.

## Legal Authority and Argument

As a preliminary matter, the "rules concerning the admissibility of evidence in criminal trials do not apply to the presentation and consideration of information at the [detention] hearing." 18 U.S.C. § 3142(f). Specifically, the presentation of hearsay evidence is permitted and the government may proceed by proffer. *United States v. Smith*, 79 F.3d 1208, 1210 (D.C. Cir. 1996). Moreover, the government is not required to "spell out in precise detail how the government will prove its case at trial, nor specify exactly what sources it will use." *United States v. Martir*, 782 F.2d 1141, 1145 (2d Cir. 1986). *See also United States v. Williams*, 798 F. Supp. 34, 36 (D.D.C.

1992). A pretrial detention hearing should not be used as a discovery device and cross-examination should be limited to the disputed issues, since the detention hearing is not to be turned into a mini-trial and is not to be used as a subterfuge to obtain discovery. *See Smith*, 79 F.3d at 1210; *see also Williams*, 798 F. Supp. at 36.

## I.    The Bail Reform Act Factors All Favor Detention Given Defendant's Risk of Flight and Danger to the Community

The United States seeks detention pursuant to 18 U.S.C. §§ 3142(d)(1)(A)(iii) (on probation or parole), 3142(f)(1)(A) (crime of violence), and 3142(f)(1)(E) (felony involving possession of a firearm), because the defendant is charged with committing a crime of violence where multiple firearms were used while he was on supervised probation for conspiracy to commit robbery.

A review and understanding of the facts and circumstances in this case demonstrate that there are no conditions or combination of conditions that would assure the safety of the community or the defendant's return to Court should he be released. *See* 18 U.S.C. § 3142(e)(1). All four § 3142(g) factors favor detention pending trial, including: (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the defendant; (3) his history and characteristics; and (4) the nature and seriousness of the danger to any person or the community that would be posed by his release. *See* 18 U.S.C. § 3142(g).

### A.    The Nature and Circumstances of this Offense Merits Detention.

Lover's conduct is egregious and weighs heavily in favor of pretrial detention. As an initial matter, the defendant was one of two shooters in a drive-by shooting that aimed to kill the complainant. As noted above, the defendant armed himself with an AK-47 style rifle, stalked the complainant in a car, pulled up next to the driver's side of the complainant's car, pointed the rifle

at the complainant, and fired multiple times at the complainant while co-defendant Warfield fired his own hail of bullets at the complainant. Warfield and Lover's gunfire struck the complainant's back windshield, passenger side window, and passenger side headrest. *See* Figures 16-18, *infra*. Had the bullet that struck the passenger side seat hit two feet to the left, it is more than likely that the complainant would have been struck in the head, causing serious bodily injury or even death.



*Figure 16: Complainant's Back Windshield.*



*Figure 17: Complainant's Passenger Side Window.*



*Figure 18: Complainant's Passenger Side Headrest.*

Even more troubling, the defendant and his co-defendants committed this drive-by shooting approximately 500 feet (or approximately a 2-minute walk) from an elementary school –

*during school hours on a Tuesday*. *See* Figure 19.



*Figure 19: Distance Between the Drive-by Shooting and an Elementary School.*

According to the Rocket Rise Academy's website, the school has 658 students, ages 3 to 10 years old, enrolled at the school. *See* Rocket Public Schools, *Rise Academy*, https://www.rocketshipschools.org/schools/rise-academy/ (last visited on April 28, 2024). Two detectives saw Mullins driving recklessly down the street, seconds before he lost control of the car he was driving and crashed it into the woods. The defendants' actions were not only reckless but endangered the lives of small children. Indeed, surveillance video captured a small child holding the hand of an adult crossing the street *less than 30 seconds* before the defendants' committed the drive-by shooting at that very same spot. *See* Figure 20.



*Figure 20: Small Child Holding the Hand of an Adult, Crossing the Street.*

Furthermore, the defendants not only disregarded the safety of an entire elementary school and put a little child and her caregivers in danger, but they jeopardized others as well. As Warfield and the defendant shot at the complainant's car, Mullins drove past a black sedan so that it was positioned between the shooters and the complainant, directly placing the driver in the direct line of fire.



*Figure 21: Complainant's Car in Foreground. Black Sedan in the Field of Fire.*

The defendant's conduct here was exceptionally brazen. A drive-by shooting where he fired multiple rounds from an assault rifle, while his co-defendant fired a second weapon, in a residential neighborhood, with police nearby, is incredibly reckless. Any stray bullets could have struck a nearby home, a passerby, or even teachers and children at the elementary school. That he committed this shooting during school hours…near where children play…is *very* serious and dangerous and weighs in favor of detention.

**B.**      **The Weight of the Evidence Against the Defendant is Strong.**

The second factor, the weight of the evidence, strongly favors detention. Two CCTV cameras captured the drive-by shooting that occurred at approximately 11:25 AM. A couple of minutes later, Mullins crashed the SUV he was driving near where two PGPD detectives were standing as they were investigating an unrelated case. Both detectives saw all three defendants get out of the crashed SUV, run into the woods adjacent to 22nd Street, and then helped MPD officers arrest the defendants by directing them to the location where the defendants were hiding. With the help of the two PGPD detectives, all three defendants were arrested within six minutes of the shooting, and immediately taken out of the woods. As Lover was brought out of the woods, PGPD Detective Stokes identified him as the person who got out of the SUV carrying the rifle. When asked how confident he was in his identification of Lover, Detective Stokes said that he was 100% confident. The detective's identification of Lover is bolstered by his observation that Lover had been carrying a ***blue*** rifle, a rather unique and uncommon description of a firearm. Importantly, not only did surveillance cameras capture an individual consistent with Lover shooting a rifle with blue markings, but police also recovered a rifle with blue tape on the barrel along Lover's flight path.

The weight of the evidence should be considered equally with the other § 3142 factors. Notably, in *Blackson*, following a thorough review of the text of § 3142 and decisions analyzing this factor, Judge Howell found that "the weight of the evidence should not automatically be weighed less than the remaining statutory pretrial detention factors." 2023 WL 1778194, at *8. Instead, "the weight of the evidence against [a] defendant [should] be weighed as all factors are—in accordance with the specific facts of this case—to determine whether pretrial detention is appropriate." *Id.* at *10. In an unpublished opinion, the D.C. Circuit affirmed Judge Howell's decision. *United States v. Blackson*, No. 23-3020, 2023 WL 2663034 (D.C. Cir. Mar. 28, 2023). The Second Circuit reached the same decision after a thorough and careful analysis of the issue. *United States v. Zhe Zhang*, 55 F.4th 141, 149-150 (2d Cir. 2022). This Court should follow *Blackson* and *Zhang*; this factor should be given no less weight than any other factor.

Indeed, "if the evidence against a defendant is overwhelming, credible, helpful, and important to the government's case in chief, that may increase the risk that defendant will flee to avoid future Court proceedings and may indicate that the defendant is a present danger to himself or the community if the government's allegations later prove to be true." *Blackson*, 2023 WL 1778194, at *10. This is such a case, and the defendant should be detained pretrial.

## C.      The Defendant's History and Characteristics Merit Detention.

The third factor—the history and characteristics of the defendant—also heavily favors detention. First, the defendant, only 27 years old, has a long, consistent, and recent history of violence as demonstrated by Chart 1.

| Chart 1 - Lover's Violent History | | | |
|---|---|---|---|
| Sentence Date | Docket Number | Charge | Disposition |
| 03/18/2013 | 2012-CF3-008709 | Attempted Robbery | *Confinement* 6 Months |
| 11/07/2013 | 2013-CMD-017220 | Simple Assault | *Confinement* 15 Days |
| 10/23/2015 | 2015-CF3-010264 | Assault With a Dangerous Weapon (Gun) | *Confinement* 36 Months |
| 07/09/2019 | C-02-CR-19-000128 | Conspiracy to Commit Robbery | *Confinement* 6 years imposed/ 6 years suspended |
| 07/25/2019 | 135082C | Robbery | *Confinement* 15 years imposed/12 years suspended |

The chart shows the defendant has engaged in violence for the better part of his adult life and has steadily escalated the level of his violence over the last decade. He began his assaultive career committing Simple Assault, moved to Assault with a Dangerous Weapon (Gun), and culminated with his attempt to kill the complainant with an assault rifle in the instant offense. This escalating assaultive behavior alone shows that the defendant is a danger to the community. When combined with his three robbery convictions there is no doubt that the defendant is either unwilling or incapable of curbing his violent conduct.

Second, the defendant has a history of not complying with supervision. As noted on page 3 of the PSR, when the defendant committed the instant offense, he was on supervised probation in Anne Arundel County, Maryland case C-02-CR-19-000128 after he was convicted of Conspiracy to Commit Robbery. Yet, despite being under supervision since his release in 2021, Lover was one of two shooters in a brazen daytime drive-by shooting. Moreover, according to the

PSR the defendant's supervised release has been revoked three times – twice in 2012 CF3 008709 and once in 2015 CF3 010264 – for failing to comply with the terms of his release. *See* PSR at 4, 5. Given the defendant's abysmal history of compliance, it is highly unlikely that the defendant will comply with this Court's terms of release since he has a demonstrated history of failing to comply with the terms of supervised release imposed upon him by other courts.

In addition to the defendant's long and violent criminal history, he also has a history of failing to show up to Court when ordered and therefore is a flight risk. *See* PSR at 2. Below, in Chart 2, is the defendant's bench warrant history.

| Chart 2 - Lover's Bench Warrants History | | | | |
|---|---|---|---|---|
| **Warrant Type** | **Docket Number** | **Date Issued** | **Date Disposed** | **Disposition** |
| Bench | 2018-CTF-011444 | 9/21/2018 | 10/23/2018 | **Executed** |
| Bench | 2013-CMD-017220 | 10/25/2013 | 11/7/2013 | Quashed |
| Bench | 2012-CMD-017218 | 1/15/2013 | 3/14/2013 | **Executed** |
| Bench | 2012-CF3-008709 | 3/8/2013 | 3/14/2013 | **Executed** |

Three things are notable about the defendant's bench warrant history. First, the defendant has received a bench warrant in nearly every D.C. Superior Court criminal case that he was the defendant in since his very first criminal case. Second, the defendant absconded for even relatively minor crimes. According to the PSR, the defendant absconded in 2018 CTF 011444 when he was charged with driving without a permit. Given the defendant's willingness to abscond for relatively minor offenses, the Court should have no confidence that the defendant will appear for an offense in which he tried to murder someone. Third, the defendant absconded for nearly a month in two cases – 2012 CMD 017218 and 2018 CTF 011444 – before he was apprehended. Finally, in

addition to the defendant's previously executed bench warrants, the defendant was convicted of a misdemeanor Bail Reform Act ("BRA") on April 3, 2013, in 2013 CMD 004043. The defendant's history of executed bench warrants, combined with a BRA conviction, is strong evidence that the defendant will flee, given the serious nature of the charges he faces.

The defendant's participation in such a violent crime while on supervision establishes that he will not abide by any conditions of release set by this Court. Moreover, the defendant's history of executed bench warrants and his BRA conviction strongly suggests that he is a flight risk, if released by the Court.

### D.    The Defendant Presents a Danger to the Community.

The fourth factor, the nature and seriousness of the danger to any person or the community posed by the defendant's release, similarly weighs heavily in favor of detention. Lover's history shows that he is reckless, impulsive, and escalating in his willingness to use violence.

As noted above, Lover has shown an escalating willingness to use violence and this willingness to use violence demonstrates that he poses a danger to the community if he is released.

Moreover, the recklessness and impulsivity with which Lover displayed while using violence also weighs in favor of detention. The still photograph below is the scene of the shooting just *14 seconds* before the defendants committed the drive-by. *See* Figure 22, *infra*. In the photo, a marked MPD cruiser drives down the street; and further down the street, Officer Cruz's scout car, facing the direction of the shooting, is circled in yellow. Yet, despite two visible and obvious police cars, Lover and Warfield persisted in their attempt to kill the complainant and sprayed bullets from the SUV Mullins was driving. The fact that they engaged in such rash conduct near heavy police presence and where hundreds of young children play every day, demonstrates how

dangerous the defendants are to the community.



*Figure 22: Two MPD Cars Patrolling the Area 14 Seconds before the Drive-by.*

The defendant's impulsivity and recklessness, as well as his lengthy and consistent history of escalating violence, establishes that he is a danger to the community. In addition, he has a demonstrated bench warrant history and has been unsuccessful on supervision numerous times. Thus, all four factors weigh heavily in favor of the defendant's detention pending trial.

### Conclusion

The government respectfully requests that the Court issue an Order granting its motion that the defendant be held without bond pending trial.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY
D.C. Bar No. 481052

By:  /s/ *Jared English*
JARED ENGLISH
Assistant United States Attorney
D.C. Bar No. 1023926
United States Attorney's Office
601 D Street, N.W.
Washington, D.C. 20530
Telephone: 202-465-0089
Email: Jared.English@usdoj.gov

23